*618 OPINION OF THE COURT
Marcy S. Friedman, J.
In these CPLR article 78 proceedings, petitioner Develop Don’t Destroy (Brooklyn), Inc. (DDDB) and petitioners Prospect Heights Neighborhood Development Council, Inc. and others (collectively PHND) challenged the affirmance, on September 17, 2009, by respondent New York State Urban Development Corp., doing business as Empire State Development Corp. (ESDC), of a modified general project plan (2009 MGPP) for the Atlantic Yards Project in Brooklyn (the Project), to be constructed by respondent Forest City Ratner Companies (FCRC). By decision dated March 10, 2010 (prior decision), this court denied the petitions (26 Mise 3d 1236[A], 2010 NY Slip Op 50424[U] [2010]). Petitioners now move for leave to reargue and renew the petitions.
On these motions, petitioners argue that the court erred in rejecting petitioners’ claim that ESDC violated the State Environmental Quality Review Act (SEQRA) (ECL 8-0101 et seq.) by approving the 2009 MGPP without preparing a supplemental environmental impact statement (SEIS) as a result of changes to the Project. Petitioners also argue that the court erred in rejecting petitioners’ claim that ESDC violated the New York State Urban Development Corporation Act (UDCA) (L 1968, ch 174, § 1, as amended [McKinney’s Uncons Laws of NY § 6251 et seq.]) by finding that the Project is a plan within the meaning of UDCA § 10 (c) (McKinney’s Uncons Laws of NY § 6260 [c]). Petitioners’ motions are based on the terms of a master Development Agreement, entered into between ESDC and FCRC on December 23, 2009,[1] which, according to petitioners, shows that the Project will be built-out over a 25-year period, not the 10-year period that ESDC assumed in reviewing the 2009 MGPP
The Prior Decision
The court refers to the prior decision for a detailed discussion of the parties’ claims in these proceedings. In brief, petitioners’ challenge rested primarily on the renegotiation in June 2009 by the Metropolitan Transportation Authority (MTA) of its agreement with FCRC to sell FCRC air rights necessary for develop *619 ment of 6 of the 11 residential buildings to be constructed in Phase II of the Project. In particular, petitioners cited MTA’s agreement to permit FCRC to acquire the air rights over a 15-year period extending until 2030, rather than to require FCRC to purchase all of the air rights at the inception of the Project, as had been the case when the original Project plan was approved in 2006. Petitioners argued that ESDC ignored the impact of the renegotiated MTA agreement on the time frame for construction, and improperly continued to use the 10-year build-out for the Project that had been used in the final environmental impact statement (FEIS) prepared in connection with the original plan.
The prior decision set forth the court’s reasons for rejecting petitioners’ UDCA claim. The court is not persuaded that it misapprehended applicable facts or law governing this claim. The remainder of this opinion will accordingly address petitioners’ SEQRA claim.
In the prior decision, the court found that ESDC based its use of a 10-year build-out on three main factors: the opinion of its consultant that the market can absorb the planned units over a 10-year period; ESDC’s intent to obtain a commitment from FCRC to use commercially reasonable efforts to complete the Project in 10 years; and FCRC’s financial incentive to do so. (2010 NY Slip Op 50424[U], *6.) The decision reasoned that, under the limited standard for SEQRA review, the court was “constrained to hold that ESDC’s elaboration of its reasons for using the 10 year build-out and for not requiring an SEIS was not irrational as a matter of law. ESDC’s continuing use of the 10 year build-out was supported — albeit, . . . only minimally — by the factors articulated by ESDC.” (Id.)
Evidence of the Terms of the Development Agreement in the
Prior Papers and in the Reargument Motions
At the time the petitions and ESDC’s opposition papers were filed, ESDC had not yet entered into a formal agreement with FCRC for development of the Project. However, in arguing that the renegotiated MTA agreement did not extend the build-out until 2030, ESDC emphasized that the MTA agreement would be subject to a set of development agreements, to be entered into between ESDC and FCRC, in which FCRC would be contractually committed to implementing the 2009 MGPR and would be required to use commercially reasonable efforts to complete the Project within 10 years, by 2019. (See e.g. ESDC *620 mem in opposition to DDDB petition at 22.)[2] ESDC supported this claim with a citation to the MGPP as well as to a summary of the Development Agreement. (Id., citing AR at 4692, 7070.)[3] The MGPP provision that ESDC cited stated in full:
“The Project documentation to be negotiated between ESDC and the Project Sponsor[s] will require the Project Sponsors to use commercially reasonable efforts to achieve this schedule and to complete the entire Project by 2019. The failure to commence construction of each building would result in, inter alia, monetary penalties being imposed upon the Project Sponsors.” (MGPIJ AR at 4692-4693.)
The summary of the Development Agreement that ESDC cited was a one-page document that described the “Development Obligation” as: “To construct the project described in the Modified General Project Plan,” including enumerated improvements. (AR at 7070.)[4]
It is undisputed that, at the time ESDC approved the 2009 MGPE the above MGPP provision and summary were the sole documents in the record before ESDC that summarized the terms of the Development Agreement. (June 29, 2010 transcript of oral argument of rearg mots [rearg tr] at 34.) As of the time ESDC filed its opposition papers to the petitions, the Development Agreement was in the process of being negotiated. (ESDC answer to DDDB petition, fact statement 1i 39.) However, ESDC cited no evidence of any terms of the Development Agreement other than the above MGPP provision and summary. Rather, in discussing the terms of the Development Agreement in its papers in opposition to the petitions, ESDC repeatedly cited *621 only the MGPP provision and summary.[5] By the time the oral argument of the petitions was held on January 19, 2010, the Development Agreement had been executed. However, ESDC continued to represent that the terms of the Development Agreement were those contained in the MGPP provision and summary. (See e.g. Jan. 19, 2010 tr at 44-46, 51, 81.)
On the reargument motions, ESDC for the first time acknowledged the existence in the Development Agreement of a 25-year *622 outside date for substantial completion of Phase II of the Project. The reargument motions also mark the first time ESDC admitted that, at the time of its review of the 2009 MGPfi ESDC knew of the 25-year outside date and “anticipated” its inclusion in the Development Agreement. (Rearg tr at 35-36.)[6]
Prior to these reargument motions, the above MGPP provision and summary were also the sole documents containing the terms of the Development Agreement that were furnished to this court. In seeking leave to renew, petitioners offer the full master Development Agreement. This agreement distinguishes between construction of the arena and Phase I buildings on the arena block, and construction of Phase II buildings which constitute 11 of the 16 residential high-rise buildings to be constructed on the Project site. The former are required to be substantially completed within or reasonably soon after the 10-year build date, and are the subject of heavy penalties in the event of delays. The latter are required to be substantially completed in 25 years or by 2035, and are apparently the subject of less stringent penalties in the event of failure to meet that deadline.
Development Agreement
As the issue before this court is the impact of the Development Agreement on ESDC’s determination to use the 10-year build-out and to approve the 2009 MGPP without requiring an SEIS, the detailed provisions of the Development Agreement regarding scheduling of the construction must be reviewed: The Agreement provides for commencement and construction of the arena well within the 10-year period. (§ 8.4; appendix A [requiring the arena to be the first or second building for which construction is commenced, and requiring the substantial completion of the arena by the “outside arena substantial completion date,” defined as the sixth anniversary of the Proj *623 ect effective date or by 2016].)[7] It also provides for commencement of the Phase I buildings on the arena block well within the 10-year period (§ 8.6 [d] [providing, subject to certain exceptions, for commencement of Phase I buildings within 3 to 10 years of the Project effective date or from 2013 to 2020]), and for substantial completion of the Phase I buildings within a 12-year period. (§ 8.6 [providing for substantial completion of the Phase I construction within 12 years of the project effective date or by 2022, subject to unavoidable delays].)[8] The agreement defines as events of default failure to commence or substantially complete the arena within the preceding deadlines (§ 17.1 [b], [d]) and failure to commence or substantially complete the Phase I construction within such deadlines. (§ 17.1 [i], [1].) Upon the occurrence of these events of default, FCRC is required to pay substantial liquidated damages (schedule 3 liquidated damages). For the arena, these damages are set at $75 million for failure to timely commence construction. (Schedule 3 at 1.) They may amount to as much as $341 million for failure to meet the outside substantial completion deadline, depending on the length of the default. {Id. at 2-3.) For Phase I, the damages for failure to timely commence construction may reach $5 million per building per year. {Id. at 4-5.) The damages for failure to meet the outside substantial completion date are based on a formula that takes into account the length of the default and the Phase I square footage that has been completed. The Phase I damages shown in the example range from $586,000 per year to $5.5 million. {See § 17.2 [a] [ii]; schedule 3 at 8-10.)
In contrast, the Development Agreement does not provide for dates for commencement of Phase II construction other than for commencement of the platform which is needed to support the construction of certain Phase II buildings. The commencement of the platform is not required until the 15th anniversary of the Project effective date or 2025. (§ 8.5.) While failure to commence construction of the platform is defined as an event of default (§ 17.1 [g]), the significant schedule 3 liquidated damages are not a remedy for such default. (§ 17.2 [a] [ii].) The Development Agreement requires Phase II construction to be substantially complete, subject to unavoidable delays, by the *624 outside Phase II substantial completion date, which is defined as 25 years following the Project effective date or 2035. (§ 8.7.) Failure to substantially complete the Phase II construction is defined as an event of default (§ 17.1 [m]), but is not a basis for the payment of schedule 3 liquidated damages. (§ 17.2 [a] [ii].) Rather, the remedy for such default is ESDC’s option to terminate the applicable Project lease for any portion of the Project site on which construction of improvements has not commenced. (§ 17.2 [a] [vi].)
The Development Agreement contains the following provision requiring FCRC to use commercially reasonable efforts to complete the project by December 31, 2019:
“[The FCRC developer entities] agree to use commercially reasonable effort to cause the Substantial Completion of the Project to occur by December 31, 2019 (but in no event later than the Outside Phase II Substantial Completion Date [defined in § 8.7 as 25 years following the Project effective date], in each case as extended on a day-for-day basis for any Unavoidable Delays.)” (§ 2.2.)
The Development Agreement provides that the article VIII deadlines for the performance of Phase I and II work shall not “modify, limit or otherwise impair” FCRC’s obligations under the preceding provision. (§ 8.1 [d].) However, the remedies provided for failure to use commercially reasonable efforts to complete the Project by 2019 are uncertain or appear to be significantly less stringent than the remedies provided for FCRC’s failure to meet the deadlines for Phase I work.
The Development Agreement provides that in the event of FCRC’s failure to use commercially reasonable efforts, ESDC may resort to remedies available through litigation — i.e., “any and all remedies available to ESDC at law or in equity under or in connection with this Agreement,” including specific performance and damages. (§ 17.2 [d].) If ESDC were to claim a breach of the commercially reasonable efforts provision, a mixed issue of fact and law would be presented. While courts are adept at interpreting legal standards, determination of this issue would be complicated by the absence of settled authority. There is a substantial body of case law, under UCC 9-627, interpreting the term commercially reasonable manner in connection with dispositions of collateral. (See e.g. Bankers Trust Co. v Dowler & Co., 47 NY2d 128 [1979].) However, this authority is not factually relevant to the construction context. The parties have *625 not cited, and the court’s research has not located, case law articulating standards for awarding damages or equitable relief for failure to use commercially reasonable efforts to meet construction deadlines. (Cf. 330 Hudson Owner, LCC v Rector, Church-Wardens & Vestrymen of Trinity Church in City of N.Y., 23 Misc 3d 1131[A], 2009 NY Slip Op 51018[U] [Sup Ct, NY County 2009].)
The Development Agreement also does not define the failure to use commercially reasonable efforts as an event of default for which schedule 3 liquidated damages are available. (§ 17.2 [a] [ii].) It does appear that such failure would qualify as an event of default for which a notice to cure is required under a catchall provision for not otherwise specified defaults. (§ 17.1 [r].) For these unspecified defaults, the Development Agreement provides for liquidated damages in the amount of $10,000 per day until the defaults are cured, or the reduced amount of $1,000 per day if, in ESDC’s “reasonable determination,” the default would not have a material adverse effect on the value or use of the Project site, or result in a condition hazardous to human health, or put the Project site in danger of being forfeited, or subject ESDC to criminal or civil liability or penalties. (§ 17.2 [a] [x].)[9] These damages are significantly lower than the schedule 3 damages available for other specified events of default. In addition, imposition of these damages would require a predicate finding, subject to the legal uncertainties discussed above, that the commercially reasonable efforts provision had been breached.
*626 Discussion
As close reading of the Development Agreement shows, the Agreement plainly contemplates an outside build date of 25 years for completion of the 11 Phase II buildings which constitute the substantial majority of the residential buildings at the Project. It provides detailed timetables, firm commencement dates for the arena and Phase I work, no commencement dates (other than for the platform) for the Phase II residential construction, and apparently far stricter penalties for failure to meet the deadlines for the arena and Phase I work than for failure to meet the 2035 outside deadline for substantial completion of the Phase II buildings or for failure to use commercially reasonable efforts to complete the Project by 2019.
In its papers in opposition to the article 78 petitions, ESDC repeatedly cited, as the basis for its continuing use of the 10-year build-out, the MGPP provision stating ESDC’s intent to require FCRC to use commercially reasonable efforts to complete the Project by 2019, and the summary of the Development Agreement (AR at 7070). Neither of these documents gave any indication that the Development Agreement would include a 25-year substantial completion date for the Phase II construction. While ESDC’s papers acknowledged that there were mandatory commencement dates for construction of the first few buildings on the arena block, the papers did not discuss the absence of any deadlines for commencement of the Phase II buildings, were completely silent as to the 2035 outside date, and contained no discussion of the disparate penalties provided for failure to meet the deadlines for Phase I and II construction. ESDC’s papers left the inaccurate impression that the commercially reasonable efforts provision was the focus of the Development Agreement, whereas the Agreement in fact contained numerous far more detailed construction deadlines for the Project which cannot be ignored in addressing the rationality of the build date.
In opposing the petitions, ESDC argued that the master closing documents could not have been included in the record because they did not exist at the time of ESDC’s approval of the 2009 MGPP (Jan. 19, 2010 tr at 67.) Significantly, although the Development Agreement had been executed as of the date the petitions were heard, ESDC did not then claim that it was unaware, at the time of the approval, that the Development Agreement would provide the 2035 outside completion date for Phase II rather than a 2019 completion date for the entire Project. *627 Rather, at the oral argument, ESDC continued to represent that the terms of the Development Agreement were described in the summary (AR at 7070) that was in the record before ESDC at the time of the approval. (Jan. 19, 2010 tr at 45.) ESDC went so far as to state that this document “summarizes many of the salient elements of the general project plan.” (Id.) This summary, of course, said nothing about the 2035 outside substantial completion date for the Phase II construction, and merely stated that FCRC was obligated to construct the Project in accord with the MGPP which, in turn, contained the provision that FCRC would be required to use commercially reasonable efforts to complete the Project by 2019.
As noted above, on the reargument motions, ESDC acknowledged for the first time that it was aware, when it reviewed the 2009 MGPR that a provision for a 2035 substantial completion date for the Phase II construction would be included in the Development Agreement that was to be negotiated. (Rearg tr at 35-36.) However, ESDC never discussed this provision in its review of the MGPR and ESDC never disclosed the provision to this court in these article 78 proceedings for review of ESDC’s determination.
ESDC had an obligation to furnish the court in these article 78 proceedings with a complete and accurate record of the proceedings before ESDC. (See generally CPLR 7804 [e]; Matter of Bellman v McGuire, 140 AD2d 262, 265 [1st Dept 1988] [holding that “CPLR 7804 (e) . . . requires the respondent in an article 78 proceeding to submit a complete record of all evidentiary facts”].) It is axiomatic that ESDC also had an obligation to accurately summarize the bases for its determination in the proceedings before this court. Thus, once the Development Agreement was executed, ESDC had an obligation to bring it to the attention of this court in order to correct the totally incomplete representations, made in the summary of the Development Agreement and in ESDC’s papers in opposition to the article 78 petitions, as to the terms that were included in the Development Agreement regarding the imposition and enforcement of deadlines for completion of the Project. Given ESDC’s failure to do so, leave to reargue and renew is warranted. (See Bellman, 140 AD2d at 265.)
In granting reargument and renewal, the court rejects ESDC’s contention that consideration of the Development Agreement would violate the well-settled tenet of article 78 review that the court is bound by the facts and record before the agency. *628 (See generally Matter of Featherstone v Franco, 95 NY2d 550, 554 [2000].) Nor would consideration of the Development Agreement violate the precept that updating of the information to be considered by the agency is “rarely warrant[ed],” given the interest in the finality of administrative proceedings. (Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 425 [1986].) The Development Agreement is not accepted to show changed circumstances since ESDC’s determination or to supplement the record that was before ESDC. Rather, although the Development Agreement was executed after ESDC’s determination, ESDC repeatedly stated that it relied on its terms in approving the MGPE In fact, at the oral argument of the petitions, ESDC represented that the Development Agreement was the “main thing” ESDC was relying on to get the Project built in conformance with the plan. (Jan. 19, 2010 tr at 45-47.) The Development Agreement is therefore accepted to correct ESDC’s incomplete representations concerning the Agreement’s terms regarding construction deadlines and their enforcement. Put another way, the Development Agreement is needed to enable the court to undertake meaningful review of ESDC’s representation that its use of the 10-year build-out in assessing environmental impacts of the MGPP was reasonable, based on its intent to require FCRC to make a contractual commitment to use commercially reasonable efforts to complete the Project by 2019.[10]
The court also rejects ESDC’s contention that reargument and renewal is unnecessary because the 25-year outside date for completion of the Project is “nothing new,” and that the documents that were in the record before ESDC — in particular, the summary of Project leases showing 25-year terms (see AR at 7068-7070) — gave notice of the 25-year outside date. (ESDC mem in opposition to rearg mots at 21.) ESDC took a completely contrary position in opposing the petitions. It dismissed petition *629 ers’ reliance on the 25-year term leases to show that the Project would take 25 years to build, stating:
“[A] sunset provision establishing the date on which the relationship between the developer and ESDC would come to an end with respect to a specific development parcel, whether or not a Project building has been successfully constructed on that parcel, sheds no light on the schedule for construction anticipated by the parties. “Outer ‘drop dead’ dates do not supersede FCRC’s contractual obligation to use commercially reasonable efforts to develop the Project by 2019.” (ESDC mem in opposition to PHND petition at 35 [citations omitted].)
To the extent that ESDC argues that reargument and renewal is unnecessary because ESDC has already taken a hard look at the impacts of delays in the construction of the Project, this contention is also unavailing. For this argument, ESDC relies on the technical memorandum (AR at 4744 et seq.) prepared at the time of ESDC’s review of the 2009 MGPR in which ESDC concluded that an extended schedule would not result in significant impacts not identified in the FEIS, and that preparation of an SEIS was not needed. (ESDC mem in opposition to PHND petition at 39.) While the technical memorandum reached this conclusion (AR at 4808), it treated the change in the Project schedule as a change from 2016 to 2019. It assumed a 10-year build-out, stating:
“The anticipated year of completion for Phase I of the project has been extended from 2010 to 2014 due to delays in the commencement of construction on the arena block. The anticipated date of the full build-out of the project — Phase II — has been extended from 2016 to 2019 for the same reason.” (AR at 4752, 4755.)
While the technical memorandum also undertook an analysis of the potential for delayed build-out, it did so on the basis of the potential for “prolonged adverse economic conditions” (id. at 4808), and not on the basis of a change in the Project schedule to provide for construction beyond 2019, much less over a 25-year period, as to which the technical memorandum was silent. Moreover, in considering delays due to economic conditions, the technical memorandum analyzed environmental impacts on traffic and parking, as well as transit and pedestrian conditions, over a five-year period beyond 2019 or until 2024, not an additional 16-year period to 2035. (Id. at 4812-4815.) It did not *630 provide a specific number of years for its analysis of other environmental impacts, including delays in the development of open space, extensions of time during which above-ground parking lots would remain in existence, impacts on neighborhood character, and effects of prolonged construction. With respect to all impacts, the technical memorandum concluded that a delay in the build-out due to prolonged adverse economic conditions “would not result in any significant adverse environmental impacts that were not addressed in the FEIS.” (Id. at 4816.)
ESDC now suggests that the construction impacts of a 10-year build-out would be the same or even more severe than the construction impacts of a 25-year build-out because, if construction were delayed, “the intensity of the construction would be greatly reduced.” (ESDC mem in opposition to rearg mots at 14-15; see also FCRC mem in opposition to rearg mots at 11.) However, the technical memorandum did not compare the environmental impacts of intense construction over a 10-year period with the impacts of ongoing construction over a 25-year period. It did not address, and the record thus lacks any expert opinion or analysis of, the impact of a potential 25-year delay in completion of the Project.
Conclusion
ESDC argues, and the court agrees, that SEQRA does not require guarantees that a project will be completed by the build date or exactitude in the agency’s selection of a build date. However, ESDC itself acknowledges that “ESDC had the responsibility to determine whether the proposed schedule was reasonable for purposes of conducting the requisite assessment of environmental impacts.” (ESDC mem in opposition to rearg mots at 5.) As the Appellate Division held in a prior litigation involving the Atlantic Yards Project, a mere inaccuracy in the build date will not invalidate the basic data used in the agency’s environmental assessment. (See Matter of Develop Don’t Destroy [Brooklyn] v Urban Dev. Corp., 59 AD3d 312, 318 [1st Dept 2009] [DDDB 7], lv denied 13 NY3d 713 [2009], rearg denied 14 NY3d 748 [2010]; see also Matter of Committee to Preserve Brighton Beach & Manhattan Beach v Council of City of N.Y., 214 AD2d 335 [1st Dept 1995], lv denied 87 NY2d 802 [1995].) As the Court also held, ESDC’s choice of the build year is not immune to judicial review. Rather, it is subject to review under the arbitrary and capricious or rational basis standard that is applicable to judicial scrutiny of any agency action in an article 78 proceeding. (DDDB I at 318.)
*631 Under this standard, as applied to a SEQRA determination in particular, the court’s review “is limited to whether the agency identified the relevant areas of environmental concern, took a ‘hard look’ at them, and made a ‘reasoned elaboration’ of the basis for its determination.” (Matter of Riverkeeper, Inc. v Planning Bd. of Town of Southeast, 9 NY3d 219, 231-232 [2007], quoting Matter of Jackson, 67 NY2d at 417.) “The courts may not substitute their judgment for that of the agency for it is not their role to weigh the desirability of any action or to choose among alternatives.” (Riverkeeper, Inc., 9 NY3d at 232 [internal quotation marks, citations and brackets omitted].) However, judicial review must be “meaningful.” (Id. at 232.) It is the court’s responsibility to “ensure that, in light of the circumstances of a particular case, the agency has given due consideration to pertinent environmental factors.” (Akpan v Koch, 75 NY2d 561, 571 [1990].)
In the prior decision, this court criticized ESDC’s lack of transparency and its failure even to mention the MTA agreement by name, but found, based on its review of the record, that ESDC was aware that the MTA agreement had made a “major change” in the Project, and had articulated reasons for its continued use of the 10-year build-out that were marginally sufficient to survive scrutiny under the limited standard for judicial review of a SEQRA determination. (2010 NY Slip Op 50424[U], *9.) Now, in what appears to be yet another failure of transparency on ESDC’s part in reviewing the 2009 MGPP, ESDC never directly acknowledged or addressed the impact of the Development Agreement on the build-out; and, in these article 78 proceedings, ESDC never brought to the court’s attention the extended construction schedule that the Development Agreement contemplates.
The Development Agreement has cast a completely different light on the Project build date. Its 25-year outside substantial completion date for Phase II and its disparate enforcement provisions for failure to meet Phase I and II deadlines, read together with the renegotiated MTA agreement giving FCRC until 2030 to complete acquisition of the air rights necessary to construct 6 of the 11 Phase II buildings, raise a substantial question as to whether ESDC’s continuing use of the 10-year build-out has a rational basis.
In the prior decision, this court accepted ESDC’s claim that because the MTA agreement permitted FCRC to acquire the air rights on a parcel-by-parcel basis, it was not inconsistent with the development scenario posited by ESDC, in which the Project *632 would proceed incrementally within the 10-year build date rather than stall until the 2030 outside date for acquisition of the air rights. (2010 NY Slip Op 50424[U], *6-7.) This rationale for continuing use of the 10-year build date was, in turn, dependent on ESDC’s assertion that it would require a contractual commitment from FCRC to use commercially reasonable efforts to complete the Project by 2019. (See id. at *7.) As such, it is also called into question by the Development Agreement that was actually negotiated.
The court makes no finding, at this juncture, as to the rationality of the 10-year build-out. Its reading of the Development Agreement was undertaken not for the purpose of making a final determination as to the proper construction of the Agreement but for the purpose of determining whether the provisions of the Agreement have relevance to the rationality of ESDC’s decision to continue to use the 10-year build date. The court has concluded that these provisions unquestionably must be addressed. Under the limited standard for SEQRA review, it is for ESDC to do so in the first instance. Where, as here, an agency action involves a specific project, “environmental effects that can reasonably be anticipated must be considered.” (Matter of Neville v Koch, 79 NY2d 416, 427 [1992].) If ESDC concludes, in the face of the Development Agreement and the renegotiated MTA agreement, that a 10-year build-out continues to be reasonable, and that it need not examine environmental impacts of construction over a 25-year period on neighborhood character, air quality, noise, and traffic, among other issues, then it must expressly make such findings and provide a detailed, reasoned basis for the findings.
In sum, the court holds that ESDC did not provide a “reasoned elaboration” for its determination not to require an SEIS, based on its wholesale failure to address the impact of the complete terms of the Development Agreement and of the renegotiated MTA agreement on the build-out of the Project. The matter should accordingly be remanded to ESDC for additional findings on this issue.[11]
It is accordingly hereby ordered that the motions of petitioners DDDB and PHND are granted to the following extent: Leave *633 to reargue and renew is granted, and the proceedings are remanded to ESDC for findings on the impact of the Development Agreement and of the renegotiated MTA agreement on its continued use of a 10-year build-out for the Project, and on whether a supplemental environmental impact statement is required or warranted.

. While the copy of the Development Agreement that is annexed to the petitions is undated, ESDC’s counsel confirmed at the oral argument of the petitions that it was executed on December 23, 2009. (Jan. 19, 2010 transcript of oral argument of petitions [Jan. 19, 2010 tr] at 46.)

. ESDC also argued that the MTA agreement set outside deadlines for FCRC to acquire the air rights needed to construct six of the Phase II buildings, but that FCRC had the option to purchase the air rights on a parcel-by-parcel basis. ESDC further argued that it expected that FCRC would exercise the option because it would be obligated to use commercially reasonable efforts to complete the Project within the 10-year deadline. (Jan. 19, 2010 tr at 51.)

. AR refers to the record before ESDC in connection with its approval of the 2009 MGPP

. The enumerated improvements are improvements of 4,470,000 gross square feet, exclusive of the arena; no less than 2,250 units of affordable housing, subject to the availability of subsidies; a completed arena for basketball and other events; at least eight acres of open space; a completed urban room; a completed upgraded railyard; a completed subway entrance; and a completed Carlton Avenue Bridge.

. Thus, for example, ESDC represented:
“With respect to schedule, the MGPP describes the anticipated timetable (AR 4687), and establishes mandatory commencement dates for construction of the first few buildings on the Arena Block (AR 4692); it then dictates that ‘the Project documentation to be negotiated between ESDC and the Project Sponsor[s] is to require the Project Sponsors to use commercially reasonable efforts to . . . complete the entire Project by 2019.’ (Id.)” (ESDC mem in opposition to DDDB petition at 17.)
AR 4687 is also a citation to a portion of the MGPP stating that “[t]he build-out of the Project is likely to occur in two phases,” with Phase I anticipated to be completed by 2014 and Phase II by 2019. AR 4692 refers to a portion of the MGPP which states that the arena is expected to open in 2011-2012, sets forth dates for commencement of construction on three other Phase I nonarena buildings, and contains the much-referenced statement: “The Project documentation to be negotiated between ESDC and the Project Sponsor[s] will require the Project Sponsors to use commercially reasonable efforts to achieve this schedule and to complete the entire Project by 2019.”
Another statement typical of ESDC’s representations as to the terms of the Development Agreement is as follows:
“Petitioners’ errors in describing the purpose and effect of the MTA term sheet are compounded by the fact that they look only to the transaction with MTA to discern FCRC’s obligations. What they apparently fail to apprehend ... is that there will be an entirely separate set of agreements between FCRC and ESDC, and that under those agreements FCRC will be contractually committed to implementing the 2009 MGPP (Fact Statement 1Í 39.) Among other things, FCRC will be required to use ‘commercially reasonable efforts’ to complete the Arena and certain Phase I buildings in accordance with a specified schedule, and to bring the Project to completion by 2019, with sanctions imposed for any failure to do so. (Fact Statement 1Í 39; AR 4692, 7070.)” (ESDC mem in opposition to DDDB petition at 22.)
The fact statement is contained in ESDC’s answer to the petition. Paragraph 39 refers to the commercially reasonable efforts provision of the MGPP (AR at 4692); to AR 7067-7069, which is a description of the project leases; and to AR 7070 which is the summary of the Development Agreement referred to in the text above.
Other substantially similar representations as to the terms of the Development Agreement are made in ESDC’s memorandum in opposition to DDDB petition (at 40), and in ESDC’s memorandum in opposition to PHND’s petition (at 34, 57).

. At the oral argument of the reargument motions, ESDC stated that the 25-year terms of the Project leases
“mateh[ed] up with what was actually in the development agreement, which is that there was the outside date [of] 25 years from project effective date .... So what we have in the development agreement is really from a contractual standpoint, that which was anticipated. There is a schedule. There is a commercially reasonable efforts provision. And then there is the outside dates that is kind of a drop-dead date, no matter what you have to complete by that date.” (Rearg tr at 35-36.)
As discussed in the text (infra at 628-629), this argument is contrary to the position taken by ESDC at the time the petitions were first heard.

. It is undisputed that the Project effective date, based on which the Development Agreement imposes deadlines, is May 12, 2010. (ESDC letter to court, dated July 2, 2010.)

. Unavoidable delays, as defined in the Development Agreement (appendix A), include typical force majeure conditions and litigation which delays construction, but not inability to obtain financing.

. ESDC argued that the liquidated damages provision set forth in section 17.2 (a) (x) would apply to failure to complete the Phase II construction work by the 25-year outside date, but only if FCRC was not using commercially reasonable efforts to complete the Project within 10 years. As stated at oral argument:
“If the reason why phase two was not progressing was that Forest City had walked away from the project or failed to use adequate efforts to complete the project, then that would be a breach of the covenant to use commercially reasonable efforts to complete the entire project within a ten-year period. And that would implicate the penalties set forth in x. [§ 17.2 (a) (x)]. However, if Forest City was using commercially reasonable efforts to proceed with the project on a ten-year schedule and notwithstanding its use of commercially reasonable efforts it was falling behind the ten-year schedule, then that would not be subject to the penalties set forth in x because there would be no breach of the commercial[ly] reasonable efforts covenant.” (Rearg tr at 31.)

. The court notes that petitioners, not ESDC, brought the Development Agreement to this court’s attention after submission but before decision of the article 78 petitions. The court rejected the proffer based on its misapprehension that petitioners were raising a new argument, not before ESDC at the time of its approval of the MGPL that the Development Agreement that was subsequently negotiated did not provide adequate guarantees that the Project would be built within the 10-year period. (See 2010 NY Slip Op 50424[U], *7 n 2.) As held above, the Development Agreement is not received on that issue but in order to correct the incomplete record furnished to this court as to the terms regarding deadlines that would be included in the Development Agreement and, hence, the reasonableness of ESDC’s use of a 10-year build-out in approving the MGPE

. This decision should not be construed as staying construction of the Project. Petitioners’ prior challenges to the original plan and in condemnation proceedings have not been successful. Thus, as of the date of the prior decision, substantial public and private expenditures had already been made and the Project was already well underway. (2010 NY Slip Op 50424[U], *9.) While *633 petitioners seek a stay in the event of a favorable decision on the reargument motions, they have not moved for reargument or renewal of their prior motion for a stay. The record is not factually developed on the current state of the construction. Nor have the parties addressed the legal issues regarding the propriety of a stay at this stage of the construction. Any decision on a stay would therefore not be proper on this record. The court notes, moreover, that while the DDDB petitioners oppose continued work on the arena (DDDB reply affirmation K 23), the PHND petitioners represent that their greatest concern is over the disruptions that would occur during extended construction of Phase II, and appear to acknowledge that the arena could be permitted to proceed. As they also note, the Phase II work is not scheduled to begin for years. (PHND reply affirmation H 15.)