OPINION OF THE COURT
Walter B. Tolub, J.
Motion sequence Nos. 001 and 002 are consolidated for disposition and disposed of in the accompanying memorandum decision.
In the aftermath of the terrorist attacks of September 11, 2001, this court has been presented with questions concerning the implementation of security measures and the creation of “secure zones” throughout the city. The instant application requires this court to revisit the issues presented in one of this court’s earliest post-September 11 security cases, the implementation of the Security Plan for One Police Plaza.
Petitioners seek, by this proceeding, to nullify the negative declaration issued by respondent, the New York City Police Department (NYPD), on the One Police Plaza Security Plan following the environmental assessment statement (hereinafter EAS) ordered by this court in accordance with the New York State Environmental Quality Review Act (hereinafter SEQRA) (see, Chatham Green, Inc. v Bloomberg, 1 Misc 3d 434 [Sup Ct, NY County 2003]). Petitioners claim that the EAS did not take a “hard look” as required by law and seek an order directing respondents to (1) prepare a full environmental impact statement (hereinafter EIS); (2) obtain the required permits and revocable consents from the respondent New York City Department of Transportation (hereinafter DOT) in connection with construction of delta barriers and closure of public streets;[1] (3) change the city map to reflect the street closings;[2] and; (4) enjoin the continued implementation of the security plan until completion of the EIS and compliance with requirements under the ULURE
Motion sequence No. 002, brought by Chatham Green, Inc., the original petitioner in the underlying action, seeks leave to *816 intervene in the instant application. Because the relief sought by the proposed petitioner is identical to that of the petitioners, and in light of the fact that the motion is made without opposition, the motion to intervene is granted.
The Parties
Petitioner Chatham Towers is a cooperative apartment complex located on the southwest corner of Worth Street and Park Row. Petitioner Jeanie Chin is a resident of Chatham Towers. Petitioner Concerned Chatham Green Shareholders is an unincorporated association of shareholders of Chatham Green, Inc., a cooperative apartment building on the east side of Park Row, located within the NYPD’s security zone. Petitioner Danny Chen is an officer of the Concerned Chatham Green Shareholders. Petitioner Southbridge Towers, Inc. is a cooperative apartment building complex located on Pearl Street. Petitioner Jan F. Lee is an owner of a business on Mott Street. Petitioner Paul J.Q. Lee is a resident of Chinatown and the former owner of a now closed business on Mott Street. Petitioner Chatham Green, Inc. is a large cooperative apartment building located on Park Row. Each of these organizations and individuals claims to have been impacted by the implementation of the NYPD’s One Police Plaza Security Plan.
Petitioners United States Congresswoman Nydia Velazquez, New York State Senator Martin Connor, Speaker of the New York State Assembly Sheldon Silver and New York City Councilman Alan J. Gerson, are federal, state and city legislative representatives of affected residents both within and outside the security zone. These officials have all expressed concern regarding the impact of the NYPD’s actions on their constituents.
The respondents, Mayor Michael Bloomberg, Police Commissioner Raymond Kelly, the New York City Police Department, the New York City Department of Transportation and the New York City Department of City Planning, are the individuals and/or city departments and agencies responsible for the creation and/or implementation of the One Police Plaza Security Plan.
History
In the aftermath of September 11, 2001, federal, state and local governments throughout the United States have struggled with the issues surrounding the design and implementation of *817 security measures necessary to protect the vast numbers of people who inhabit, work in, and visit this country. Of particular importance is the issue of security surrounding areas of government operation “control centers,” areas which few would disagree require both a heightened alert status and heightened security requirements.
As stated on several occasions prior to this, New York City is not unfamiliar with the need for heightened security. Over the last three years, the NYPD, in response to the ever-growing list of security concerns, has either implemented or participated in the implementation of various safety and security measures throughout the city, including the closure of streets and erection of checkpoints and/or street barriers at certain locations in an attempt to prevent potential attacks by vehicle bombs. Whereas the vast majority of these barriers have since been removed and the affected streets reopened, the NYPD Counter Terrorism Division has concluded that the secure zone area surrounding the NYPD headquarters at One Police Plaza ought to be maintained.
One Police Plaza Security Plan
While this city is served by numerous police precincts located throughout the city, the central operations of the NYPD are predominately located at One Police Plaza, a large complex nestled within a cluster of residential, commercial, state and federal buildings and facilities. In response to security concerns raised by the events of September 11, 2001, the NYPD set up seven checkpoints and barriers[3] located around the perimeter of NYPD headquarters and closed off Park Row, a major north-south thoroughfare, to unauthorized traffic.[4]
The checkpoint on Park Row at Worth Street is located immediately before the entrance to the driveway of the Chatham *818 Green apartment complex, making it impossible to access these buildings by any private or commercial vehicle without passing through the checkpoint. At this checkpoint, and at each of the other checkpoints at issue in this action, the NYPD has installed “Delta Barriers,” hydraulic barriers which are built into the street and raised and lowered as necessary by NYPD officers stationed at each checkpoint. Vehicles seeking access to this area, regardless of whether belonging to residents of Chatham Green or their visitors, or belonging to persons requiring access to the neighboring buildings,[5] are required to identify themselves to police officers at the checkpoints. Authorized vehicles, after showing proper identification to the guard on duty, are allowed through.[6] Respondents, however, contend that emergency vehicles are allowed to pass through the checkpoints without stopping.[7]
Petitioners claim that these checkpoints, particularly the one situated at Park Row, have adversely affected their ability to enter and exit their apartment complexes and have increased traffic congestion and pollution on neighboring streets. Petitioners additionally allege that they are directly affected by the increased noise and pollution, loss of use of their property, loss of local businesses, and increased stress on neighborhood facilities and resources (order to show cause). Petitioners further contend that “One Police Plaza is the only government building in the City of New York around which the Police Department or other City agency has closed all the adjacent streets so that no unauthorized vehicle can pass on any street running adjacent to the building” (order to show cause, verified petition at 5).
*819 The EAS
In 2003, petitioners Chatham Green, Chatham Towers, Ms. Chin, Mr. Silver, Mr. Gerson and Mr. Connor, along with several other individuals, commenced the action captioned Chatham Green, Inc. v Bloomberg (Index No. 107569/2003), seeking, among other relief, that the NYPD be ordered to conduct an environmental assessment to determine whether an EIS was needed in connection with the implementation of the subject security plan. On August 1, 2003, this court ordered the NYPD to conduct an EAS of the One Police Plaza Security Plan (Chatham Green, 1 Misc 3d 434 [2003]). In compliance with this court’s decision, the NYPD, as lead agency, carried out the required EAS, generating a report in November 2003 and supplementing it again in January 2004. Following review of the subject EAS, the NYPD issued a negative declaration on January 21, 2004, which was later amended on February 12, 2004, and again on April 1, 2004. The instant application followed.
Discussion
Standing
As a threshold matter, this court must address respondents’ challenge of petitioners’ standing to bring this lawsuit. “Generally, standing to challenge an administrative action turns on a showing that the action will have a harmful effect on the challenger and that the interest to be asserted is within the zone of interest to be protected by the statute” (Matter of Gernatt Asphalt Prods, v Town of Sardinia, 87 NY2d 668, 687 [1996]). Thus, to prevail on the instant application, petitioners must demonstrate “(1) that they will suffer an environmental injury that is in some way different from that of the public at large, and (2) that the alleged injury falls within the zone of interest sought to be protected or promoted by the statute under which the governmental action was taken” (Matter of Nature’s Trees v County of Suffolk, 293 AD2d 543, 544 [2d Dept 2002] [internal quotation marks omitted]).
However, standing to raise a SEQRA violation further requires the challenger to demonstrate that they stand to suffer an injury that is environmental and not solely economic in nature should the decision be upheld (Gernatt Asphalt Prods, at 687; see also, Matter of Mobil Oil Corp. v Syracuse Indus. Dev. Agency, 76 NY2d 428 [1990]), as economic injury is not, by itself, within the zone of interest which SEQRA seeks to protect (Vin *820 nie Montes Waste Sys. v Town of Oyster Bay, 199 AD2d 493 [2d Dept 1993]). Prevailing case law also dictates that in order to establish standing as an environmental organization, the organization must demonstrate that one or more of the organization’s members have standing to sue (Society of Plastics Indus, v County of Suffolk, 77 NY2d 761 [1991]; Matter of Long Is. Pine Barrens Socy. v Planning Bd. of Town of Brookhaven, 213 AD2d 484 [2d Dept 1995]; Matter of Long Is. Pine Barrens Socy. v Town Bd. of Town of E. Hampton, 293 AD2d 616 [2d Dept 2002]).
For the purpose of determining standing, “the zone of interests, or concerns, of SEQRA encompasses the impact of agency action on the relationship between the citizens of this State and their environment. Only those who can demonstrate legally cognizable injury to that relationship can challenge administrative action under SEQRA” (Society of Plastics Indus., 77 NY2d at 777). Of the petitioners in the within application, the court finds that only petitioners Chatham Towers, Chatham Green Shareholders, Southbridge Towers, and Ms. Chin and Mr. Chen, as residents living within the affected area, have standing to maintain this action.[8] Their collective claims of increased noise and pollution to the area fall well within the definition of “environment” as set forth in 6 NYCRR 617.2, and this court is satisfied that any changes to the area as a result of the implementation of the One Police Plaza Security Plan would affect these organizations and individuals in a manner wholly distinct from the public at large.
Petitioners’ Claims
Petitioners’ primary contention in this application is that the determination made by the NYPD was flawed because the EAS failed to take a “hard look” at the impact of the security plan and therefore violates both SEQRA and the City Environmental Quality Review Act (CEQR). Petitioners claim this is especially true in the evaluations completed for (1) community facilities and services/health care facilities; (2) socioeconomic conditions/ *821 community character; (3) traffic and parking; and (4) transit and pedestrians. Petitioners further assert that under these circumstances, a full EIS is required, as is the obtaining of required permits and revocable consents under ULURfi and amendment of the city map to reflect the street closures created under the security plan. Petitioners additionally seek an order enjoining the NYPD from completing implementation of the security plan pending full review of the security plan under ULURP
SEQRA
SEQRA[9] has long been identified as a legislative attempt to ensure that state and local agencies consider both the immediate and long-term environmental effects of their proposed actions (Matter of Spitzer v Farrell, 100 NY2d 186, 190 [2003]; see also, Akpan v Koch, 75 NY2d 561, 569 [1990]; Matter of Coca-Cola Bottling Co. v Board, of Estimate, 72 NY2d 674, 679 [1988]; Chinese Staff & Workers Assn, v City of New York, 68 NY2d 359, 361 [1986]).
Review under SEQRA is triggered whenever a proposed project may have a significant effect on the surrounding environment (ECL 8-0109 [2]; Akpan, 75 NY2d at 569). Any proposed action must therefore be assessed for potential environmental concerns, and these concerns must then be further evaluated in order to determine whether or not a significant environmental impact may result (Matter of New York City Coalition to End Lead Poisoning v Vallone, 100 NY2d 337 [2003]). There is no question that the requirements of SEQRA are substantive, “delineating the content of the EIS and requiring the lead agency to act and choose alternatives which, consistent with social, economic and other essential considerations, to the maximum extent practicable, minimize or avoid adverse environmental effects” (Akpan, 75 NY2d at 570 [internal quotation marks and citations omitted]). Compliance with SEQRA’s obligations, however, is governed by a rule of reason, as the extent to which particular environmental factors are to be considered varies in accordance with each proposal (id.).
“In assessing the significance of a proposed action under SE-QRA, the lead agency must ‘thoroughly analyze the identified *822 relevant areas of environmental concern to determine if the action may have a significant adverse impact on the environment’ ” (New York City Coalition to End Lead Poisoning, 100 NY2d at 347, quoting 6 NYCRR 617.7 [b] [3]). The lead agency must then set forth in writing a statement containing a reasoned elaboration with references to any applicable supporting documentation (6 NYCRR 617.7 [b] [4]). The initial environmental analysis conducted by the lead agency or agencies must also include a study of “the same areas of environmental impacts as would be contained in an EIS, including both the short-term and long-term effects as well as the primary and secondary effects of an action on the environment” (Chinese Staff & Workers Assn., 68 NY2d at 364 [citations omitted]). In those situations where it is determined that no significant adverse impact would occur as a result of the action, the lead agency may rely on the EAS and issue a negative statement (CEQR Technical Manual, ch 2, § 210, at 2-9; see also, Spitzer, 100 NY2d at 190). However, “[t]he threshold at which the requirement that an EIS be prepared is triggered is relatively low: it need only be demonstrated that the action may have a significant effect on the environment” (Chinese Staff & Workers Assn., 68 NY2d at 364-365).
Judicial Review
“A court’s authority to examine a SEQRA review conducted by an entity that was required to do so is limited to reviewing whether the determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion” (Gernatt Asphalt Prods., 87 NY2d at 688). Thus, the question once more in front of this court is “whether the agency identified the relevant areas of environmental concern, took a ‘hard look’ at them, and made a ‘reasoned elaboration’ of the basis for its determination” (Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 417 [1986]; Gernatt Asphalt Prods., 87 NY2d at 688; Matter of New York City Coalition to End Lead Poisoning, 100 NY2d at 347-348).
As this is not a de novo review, the court will not substitute its own judgment for that of the agency (Akpan, 75 NY2d 561, 571 [1990]). This court will, therefore, not review the question of whether an EIS is required prior to the implementation of the One Police Plaza Security Plan, and will only address the issue of whether the respondents identified the relevant areas of *823 environmental concern, took a “hard look” at them, and made a “reasoned elaboration” of the basis for its determination (see, Akpan, 75 NY2d 561, 570 [1990]; Matter of Jackson, 67 NY2d 400, 417 [1986]; Chinese Staff & Workers Assn., 68 NY2d 359, 363 [1986]). It is this court’s opinion in the instant matter that the EAS did not comply with the requirements of SEQRA and CEQR because it failed to adequately address certain issues and, in doing so, failed to meet the “hard look” requirement.
One of the areas of petitioners’ concerns in the instant application is the impact of the implementation of the One Police Plaza Security Plan on their access to services at NYU Downtown Hospital. The staff of the hospital itself is equally concerned, as indicated in a letter from NYU Downtown Hospital interim president and chief executive officer, Kenneth A. Eshak, which states that “the closures and other obstacles imposed by New York City between the Hospital and the neighborhood have lengthened the time it takes for any vehicle, including emergency vehicles participating in the 911 Response System, to bring patients from their homes and workplaces in the neighborhood to our hospital” (June 12, 2003 letter of Kenneth A. Eshak to Jack Lester, Esq.,[10] Goldschmitt affidavit, exhibit A).
The court notes that the existence and location of NYU Downtown Hospital is a glaring omission on the EAS. Although the CEQR Technical Manual clearly states that “[i]f there are any [health care] facilities within a mile or so of the project site, they should be shown on the community facilities map” (CEQR Technical Manual, ch 3, § 313, at 3C-6), the EAS fails to include the hospital, which clearly falls within a mile of the project site. More disconcerting to this court is that it does not appear that the lead agency contacted either the hospital or responding emergency medical service personnel for the hospital to better assess whether the restricted access to the streets involved could potentially affect them in any way. Instead, the EAS goes only as far as to state that “there would be no increase in the demand for health care services” (EAS at ES-16). This court finds such gross oversights on the EAS to constitute a violation of both SEQRA and CEQR.
Petitioners have also raised significant concerns about traffic and parking in the affected area, raising the allegation that the *824 EAS examined only the area immediately surrounding the created security zone in order to ascertain potential traffic and parking impacts, in short, alleging that the EAS took a “no-look” approach at the areas affected by the security plan. The CEQR Technical Manual explains that,
“[t]he traffic study area may be contiguous, or it may be set of non-contiguous intersections combined into a study ‘area.’ The traffic study area could extend from a minimum of one to two blocks from the site to as much as one-half mile or more from the site. The study area need not have a particular shape ... It is defined by the routes along which traffic proceeds to and from the site, and typically includes major arterials and streets along the most direct routes to the project site as well as significant alternate routes. Multilegged intersections and other problem locations along these routes should generally be incorporated into the traffic study area” (CEQR Technical Manual, ch 3, § 310, at 30-4).
This court’s review of the traffic areas included in the EAS clearly indicates that the impact on traffic on streets and major arteries surrounding the “secure zone” were simply not included in the study. It seems rather obvious to this court that severely limiting traffic in one area would only divert it to others. By restricting the scope of the EAS solely to the “secure zone,” the EAS fails to address potential traffic impacts on the streets most affected by the closures. The result is an arguably flawed study as the areas most impacted by the closures appear to have never been reviewed. This argument is additionally supported by the analysis of the EAS conducted by Brian T. Ketcham, which has been submitted by the petitioners (order to show cause, affidavit of Brian T. Ketcham, exhibit B). This report not only provides support to petitioners’ arguments concerning the dramatic changes to the pedestrian and vehicular traffic patterns on surrounding streets {id.), but also supports the argument, and this court’s conclusion, that the traffic studies that were conducted in the EAS were inadequate.
This court also expresses concern with respect to petitioners’ contention that the EAS inadequately described the impact that the security plan has on both pedestrian and transit traffic. The EAS limits its evaluation of traffic pattern and transit changes solely to the rerouting of buses that serve the area, and only notes that the bus stops that have been moved subsequent to *825 the implementation of the security plan remain within one-quarter mile walking distance from the residential developments most affected (EAS at ES-13). The EAS then arrives at the conclusion that “the proposed action would not have a significant impact on availability and accessibility of public transit in the study area” (id. at ES-14). However, petitioners argue, and again this court is inclined to agree, that the EAS failed to study the longer, more congested routes that city buses and private transportation vehicles must now take to reach their destinations. There is no study concerning the effects of the additional “30 buses an hour, every hour to St. James Place and Frankfort Street” (see Ketcham report at 15). There is no study concerning pedestrian traffic concerns, including, for example, more dangerous street crossings at locations such as Worth Street and St. James Place. All that the EAS addresses is the fact that the reduction of vehicular traffic within the “secure zone” has improved the pedestrian traffic conditions in that same location (EAS at ES-13). No study, however, appears to have been conducted with respect to the area immediately surrounding the “secure zone.”
Although it is a difficult decision for this court to make for the reasons aforementioned, it remains clear that the NYPD failed to meet the “hard look” requirement that is required under applicable CEQR and SEQRA provisions, and this court is left no other alternative than to order that the NYPD conduct a full EIS. It may be that the EIS will, in the end, demonstrate that the impact is not significant; yet, an EIS procedure is the most appropriate path to follow at this juncture (CEQR Technical Manual, ch 2, § 230, at 2-10).
Injunctive Relief
Petitioners have also requested injunctive relief with respect to the implementation of the One Police Plaza Security Plan. Specifically, petitioners claim that the city is no longer in a state of emergency, and that such time has long passed (petitioners’ mem of law at 31). Subsequently, petitioners request that the delta barriers be removed and call for the restoration of the traffic patterns to their pre-One Police Plaza Security Plan state (petitioners’ mem of law at 32).
The decision of whether to grant a preliminary injunction, oft considered to be a drastic remedy, is one that lies within the sound discretion of the trial court (Borenstein v Rochel Props., 176 AD2d 171 [1st Dept 1991]; see also, Barr, Altman, Lipshie *826 and Gerstman, New York Civil Practice Before Trial § 17:03 [James Publ. 2001-2002]; CPLR 6301). This provisional remedy is, therefore, only appropriate where the moving party has ■established (1) a likelihood of success on the merits of the action; (2) irreparable harm absent issuance of a preliminary injunction; and (3) a balancing of the equities in favor of the movant (Aetna Ins. Co. v Capasso, 75 NY2d 860 [1990]; Doe v Axelrod, 73 NY2d 748, 750 [1988]). Allegations that are bare or merely conclusory are deemed insufficient for this purpose (Doe, 73 NY2d 748, 750 [1988]; Business Networks of N.Y. v Complete Network Solutions, 265 AD2d 194 [1st Dept 1999]). Where the moving party seeks a preliminary injunction “that will affect government action taken in the public interest pursuant to a statutory or regulatory scheme, the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard” (No Spray Coalition, Inc. v City of New York, 252 F3d 148, 149 [2d Cir 2001] [internal quotation marks omitted], quoting Beal v Stern, 184 F3d 117, 122 [1999]). In the instant application, petitioners who seek to alter the status quo simply have not met this burden.
Petitioners’ primary argument in support of their request for injunctive relief is the assertion that this city is no longer operating under a “state of an emergency.” While it may be true that this city is thankfully not operating under a “state of emergency,” the assertion is both nonetheless misleading and conclusory, as this city has rarely dipped below the “Code Orange” level that indicates a “high risk of terrorist attacks” (Department of Homeland Security Web site: <http:// www.dhs.gov>). In fact, as of August 1, 2004, while the national alert level remained at a “Code Yellow” indicating a “significant risk of terrorist attacks,” the level for New York City was raised once more to “Code Orange.” Thus, petitioners’ argument that the city is not operating under a heightened level of alert is hardly persuasive.
Morever, even if petitioners could demonstrate a “clear” or substantial likelihood of success as is required in cases where the injunction sought will alter rather than maintain the status quo (Rodriguez u DeBuono, 175 F3d 227, 233 [2d Cir 1999]), it is doubtful that they would succeed in demonstrating that the balance of the equities lies in their favor.
“Whenever a request for a preliminary injunction implicates public interests, a court should give some consideration to the balance of such interests in deciding whether a plaintiff’s *827 threatened irreparable injury and probability of success on the merits warrants injunctive relief’ (Time Warner Cable of NY. City, a Div. of Time Warner Entertainment Co., L.P. v Bloomberg L.P., 118 F3d 917, 929 [2d Cir 1997]). In the instant application, the circumstances surrounding One Police Plaza and the accompanying safety concerns must be strongly considered, given the fact that thousands of people are immediately affected by the security implementations in the area, or lack thereof. Petitioners have, time and again, made representations that “One Police Plaza is the only government building in the City of New York around which the police Department or other City agency has closed all the adjacent streets so that no unauthorized vehicle can pass on any street that runs adjacent to the building” (order to show cause, verified petition at 5). Even if, for the sake of argument, this court were to accept this assertion as true, the petitioners must concede the uniqueness of the location at issue. In addition to being adjacent to One Police Plaza, the central nerve of the New York City Police Department, the area in question also neighbors several residential complexes, two federal courthouses, one state courthouse (where this court sits), and two detention facilities, one of which held the defendants implicated in the 1993 World Trade Center bombing. Certainly, the NYPD has not frivolously made the decision to ensure that this area remains under constant surveillance and protection. Accordingly, while this court finds that a full EIS of the One Police Plaza Security Plan to be appropriate, it will not at this juncture assume to have a better grasp of security matters and current security needs for this area than the NYPD. For those reasons, the injunctive relief requested by petitioners is denied.
Petitioners’ remaining request for formal changes to be made to the city map is also denied. The utilization of delta barriers is a method by which vehicular access may be restricted. Within the context of the One Police Plaza Security Plan, the streets are not deemed closed,[11] as upon presentment of proof that an individual is using the road for an authorized purpose, access is granted. A street that allows for “restricted access” should not require modification of the city map to reflect permanent closure. Instead, it should remain a legally mapped street. Because there is no modification required to the city map in this instance, ULURP is not implicated.
*828 Accordingly, it is ordered that motion sequence No. 002 seeking leave to intervene in the instant matter is granted; and it is further ordered that respondents are directed to undertake an environmental impact statement with regards to the implementation of the One Police Plaza Security Plan and the delta barriers on Park Row; and it is further ordered that during the pendency of the environmental impact statement, respondents may maintain the existing delta barriers; and it is further ordered that the environmental impact statement shall be completed within 90 days of service of this order with notice of entry; and it is further ordered that the remainder of petitioners’ application is denied.

. Petitioners contend that the NYPD has neither sought nor obtained permits or revocable consents as required by the DOT for any of the closures created by the security plan, and these not only require DOT approval, but also require review by the New York City Department of City Planning and application of the regulations established under the Uniform Land Use Review Procedure (ULURP).

. These changes would also require processing under ULURE

. It is important to distinguish here that only vehicular access is restricted at the vast majority of these checkpoints. Pedestrians may access virtually all of the “restricted vehicle” zones, the exception being the recently erected fenced perimeter located immediately adjacent to One Police Plaza.

. As identified in the EAS, the security checkpoints for vehicles, at which delta barriers have been installed, are located at Park Row, west of Worth Street; Park Row, near the Brooklyn Bridge; Pearl Street at Foley Square; Pearl Street at either side of Park Row; Pearl Street and St. James Place; Madison Street at St. James Place; Rose Street at Pearl Street; Rose Street at Avenue of the Finest; and Avenue of the Finest at Pearl Street (ES-1). Additionally, the proposed plan sought the creation of “sally ports” requiring a second delta barrier installation at Madison Street and St. James Place; Pearl Street and St. James Place; Avenue of the Finest and Pearl Street; at two *818 roadway access points for the Brooklyn Bridge and at Park Row, west of Worth Street (ES-1, ES-2).

. For example, for deliveries to locations within the “secure zone” including, but not limited to state and federal courthouses, state and federal correctional facilities, etc.

. The court independently notes that on occasion, vehicles attempting to enter certain areas that have been blocked by delta barriers are subject to trunk searches prior to being granted access. This is particularly true when accessing the area located on Pearl Street between the state and federal courthouses.

. Respondents’ contention is that emergency vehicles would not be stopped from responding to emergency calls in the area. However, opposition is expressed by members of NYU Downtown Hospital, who claim to have never been contacted by the NYPD during the EAS, and argue that the coordination of emergency services would require an untested “relay-system” of calls, and does not offer a guarantee that emergency vehicles would not be stopped during a response (order to show cause, affidavit of David Goldschmitt, M.D.).

. Petitioners Jan E Lee and Paul J.Q. Lee, having alleged only economic damages, do not acquire standing to allege a SEQRA violation Winnie Montes Waste Sys., 199 AD2d 493 [1993]). Petitioners Congresswoman Velazquez, New York State Senator Connor, Speaker Silver, and Councilman Gerson do not acquire standing because they cannot demonstrate that they suffer injury from the actions of the NYPD’s implementation of the security plan (Matter of Lee v New York City Dept. of Hous. Presero. & Dev., 212 AD2d 453 [1st Dept 1995]; Society of Plastics Indus., 77 NY2d 761 [1991]).

. CEQR, as delineated in 62 RCNY 5-01 et seq., sets forth the process by which city agencies are to conduct environmental review of proposed discretionary actions. Bearing a strong similarity to SEQRA, CEQR does not require review of a proposed action when it would not otherwise be required by SEQRA (Matter of Markowitz v Bloomberg, 2 Misc 3d 558, 567 [Sup Ct, Kings County 2003]).

. The court recognizes the recipient of this letter as the attorney of record in Chatham Green, Inc. v Bloomberg.

. Respondents argue that the delta barriers that have been installed are not permanent, rather, they are temporary structures that may be removed if and when present threat levels subside.