OPINION OF THE COURT
Marcy S. Friedman, J.
Procedural History
These CPLR article 78 proceedings, brought under the State Environmental Quality Review Act (SEQRA), challenge modification of the plan for development of the Atlantic Yards Project in Brooklyn (the Project). In prior proceedings, petitioner Develop Don’t Destroy (Brooklyn), Inc. and petitioners Prospect Heights Neighborhood Development Council, Inc. and others challenged the affirmance, on September 17, 2009, by respondent New York State Urban Development Corp., doing business as the Empire State Development Corp. (ESDC), of the modified general project plan (2009 MGPP) for the Project, which is to be constructed by respondent Forest City Ratner Companies or its affiliates (FCRC). By decision and order dated March 10, 2010, this court denied the petitions. By decision and order dated November 9, 2010, the court granted leave to reargue and renew. On reargument, the court held that ESDC did not provide a reasoned elaboration for its continuing use of a 10-year build date for the Project and its determination not to require a supplemental environmental impact statement (SEIS), based on its wholesale failure to address the impact on the build date of the complete terms of its Development Agreement with FCRC and of a renegotiated agreement between the Metropolitan Transportation Authority (MTA) and FCRC. The court remanded the matter to ESDC for findings on the impact of the agreements on ESDC’s continued use of the 10-year build date, and on whether an SEIS is warranted or required pursuant to SEQRA. (30 Misc 3d 616, 632 [Nov. 9, 2010].)
In December 2010, in response to the court’s order, ESDC’s environmental consultant, AKRF, Inc., prepared a Technical Analysis of an Extended Build-Out of the Atlantic Yards Arena and Redevelopment Project (Technical Analysis) (supplemental administrative record [SAR] 7637 et seq.).[1] ESDC also issued a document entitled ESDC Response to Supreme Court’s November 9, 2010 Order (ESDC Response) (SAR 7728 et seq.). By resolution dated December 16, 2010, ESDC concluded:
*333 “1. The Development Agreement and MTA Agreement (collectively, the ‘Development Contracts’) do not have a material effect on whether it is reasonable to use a 10-year construction schedule for the purpose of assessing the environmental impacts of the Project. . . .
“2. As of the date of these findings, it appears unlikely that the Project will be constructed on a 10-year schedule ....
“3. A delay in the 10-year construction schedule, through and including a 25-year final completion date, would not result in any new significant adverse environmental impacts not previously identified and considered in the FEIS [final environmental impact statement] and 2009 Technical Memorandum and would not require or warrant an SEIS. ...” (Dec.
16, 2010 resolution, SAR at 7631.)
ESDC further resolved that “such findings do not require any modification to the Tech Memo, and do not disturb the prior determination of the Corporation that no Supplemental Environmental Impact Statement is required for the Project’s Modified General Project Plan.” (Id.) Petitioners’ supplemental petitions challenging ESDC’s December 16, 2010 findings followed.
The Atlantic Yards Project has been described as “the largest single-developer project in New York City history.” (Matter of Develop Don’t Destroy [Brooklyn] v Urban Dev. Corp., 59 AD3d 312, 326 [1st Dept 2009, Catterson, J., concurring] [DDDB /], lv denied 13 NY3d 713 [2009], rearg denied 14 NY3d 748 [2010].) The Project extends over 22 acres and is to be built in two phases. Phase I includes a sports arena that will serve as the new home of the New Jersey Nets, four to five buildings in the vicinity of the arena, a new MTA/Long Island Railroad (LIRR) rail yard, and transit access improvements including a new subway entrance. Phase II covers construction of 11 of the Project’s 16 high-rise buildings, which will contain commercial space and approximately 5,000 to 6,000 residential units, 2,250 of which will be affordable housing units. Phase II also includes development of eight acres of publicly accessible open space.
Petitioners contend that the MTA agreement and the Development Agreement, negotiated by ESDC at the time of the 2009 MGPfi have significantly extended the time frame for the build-out of Phase II of the Project, rendering the 10-year build date an impermissible basis for environmental analysis. Respondents dispute the impact of the agreements on the build date. They *334 contend that it was reasonable for them to rely on the 10-year build date, which ESDC used as the basis for its analysis in the 2006 final environmental impact statement (FEIS) prepared in connection with the original plan, and continued to use in the 2009 technical memorandum prepared in connection with the 2009 MGPP
ESDC claims, and petitioners do not dispute, that even under a prolonged build-out, the timing of completion of the arena, one of the buildings in the vicinity of the arena, and the other Phase I construction would not be “materially” affected. (Technical Analysis, SAR at 7638.)
The court refers to its March 10 and November 9, 2010 decisions for an extensive discussion of the parties’ claims and of the bases for the court’s prior determinations.
Use of 10-Year Build Date
Petitioners’ initial challenge to the 2009 MGPP was based on the MTA’s renegotiation in June 2009 of its agreement with FCRC to sell FCRC the air rights to the rail yard owned by the MTA. These air rights are necessary to construct 6 of the 11 Phase II buildings which are to be built on a platform to be constructed over the MTA rail yard. Under the agreement between the MTA and FCRC that was in effect at the time of ESDC’s approval of the Project plan in 2006, FCRC was required to pay $100 million to the MTA at the inception of the Project for the air rights. Under the renegotiated agreement, FCRC will pay $20 million for acquisition of the property interests necessary for the development of the arena block, will provide the MTA with a letter of credit to secure the obligation to build an upgraded MTA/LIRR rail yard, and will pay the balance of the $100 million on an installment schedule that affords FCRC until 2030 to acquire the air rights necessary for construction of six of the Phase II buildings, although it permits FCRC to acquire the air rights for each of the six parcels as the full price for the parcel is paid. (See 26 Misc 3d 1236[A], 2010 NY Slip Op 50424[U], *2 [Mar. 10, 2010].) In connection with ESDC’s approval of the 2009 MGPI] ESDC’s staff characterized the change in site acquisition as a “major change” to the Project. (June 23, 2009 memorandum, AR at 4677-4678.)
In its decision denying the petitions, this court held that under the applicable standard for SEQRA review, ESDC’s elaboration of its reasons for continuing to use the 10-year build-out was supported, albeit minimally, by the factors articulated *335 by ESDC, including its intent to obtain a commitment from FCRC, in a development agreement under negotiation, to use commercially reasonable effort to complete the Project in 10 years. (2010 NY Slip Op 50424[U], *11.)
On the reargument motion, petitioners argued that the continuing use of the 10-year build-out was belied not only by the MTA agreement but by the detailed terms of the Development Agreement that ESDC actually negotiated, including significantly extended dates for Phase II construction. In remanding to ESDC for findings on the reasonableness of its continuing use of the 10-year build date, this court reasoned that in approving the 2009 MGPR ESDC claimed to have relied on a provision in the Development Agreement being negotiated with FCRC which would require FCRC to use “commercially reasonable effort” to complete the Project within 10 years, by 2019. The court found, however, that ESDC knew at the time of its approval of the MGPR but did not bring to the court’s attention, that the Development Agreement would require the arena and Phase I buildings on the arena block to be substantially completed within or reasonably soon after the 10-year build date, but would provide for a significantly extended outside substantial completion date of 25 years, or 2035, for the Phase II construction (11 of the 16 residential high-rise buildings on the Project site). (30 Misc 3d at 621-622.) The court also discussed at length the substantially greater penalties provided for delays in Phase I construction than for delays in Phase II construction, or for failure to use commercially reasonable effort to complete the Project by 2019, as well as the stringent deadlines for commencement of Phase I construction and the absence of deadlines, with limited exceptions, for commencement of Phase II construction. (Id. at 622-625.)
In determining that reargument should be granted, the decision concluded:
“The Development Agreement has cast a completely different light on the Project build date. Its 25-year outside substantial completion date for Phase II and its disparate enforcement provisions for failure to meet Phase I and II deadlines, read together with the renegotiated MTA agreement giving FCRC until 2030 to complete acquisition of the air rights necessary to construct 6 of the 11 Phase II buildings, raise a substantial question as to whether ESDC’s continuing use of the *336 10-year build-out has a rational basis.” {Id. at 631.)
In its findings on the remand, ESDC claims that it disclosed, at the time of its approval of the 2009 MGPR that the outside dates for construction would extend “well beyond 10 years.” (Dec. 16, 2010 Resolution, SAR at 7631.) As discussed at length in the court’s November 9, 2010 decision, that claim is patently incorrect. In what the court termed a failure of transparency, ESDC made no mention of the provision in the Development Agreement for a 25-year substantial completion date for Phase II and, instead, repeatedly cited the provision requiring FCRC to use commercially reasonable effort to complete the Project in 10 years. (30 Misc 3d at 626-627, 631.)[2]
In remanding the matter to ESDC for further findings on the effect of the MTA agreement and Development Agreement on the reasonableness of the 10-year build date, the court afforded ESDC an opportunity to correct its failure to address the impact of these agreements, and to respond to this court’s preliminary reading, in the November 9, 2010 decision, of the terms of the Development Agreement affecting deadlines for construction of the Project. Significantly, in its findings on the remand, ESDC does not differ with the court’s reading of the Development Agreement as providing detailed timetables and firm commencement dates for the arena and Phase I work; no commencement dates for Phase II work, other than the platform which is not required to be commenced until 2025, and one Phase II building on block 1129 which is not required to be “initiated” until 2020; and far stricter penalties for delays in Phase I work than for delays in Phase II work. (30 Misc 3d at 623-624; ESDC Response, SAR at 7734-7737; Technical Analysis, SAR at 7639 [block 1129].) Nor does ESDC contest the court’s conclusion (30 Misc 3d at 626) that ESDC would face significant legal difficulties *337 or, as ESDC puts it, “complexities ... in establishing FCRC’s failure to proceed with the Project in a commercially reasonable manner” so as to meet the 10-year build out. (See ESDC Response, SAR at 7748.)[3]
*338 ESDC nevertheless insists that it was reasonable for it to continue to rely on the Development Agreement provision
*339 requiring FCRC to use commercially reasonable effort to meet the 10-year deadline. (ESDC Response, SAR at 7746.) In support of this contention, ESDC relies on its characterization of the outside dates for Phase II construction in the Development Agreement as the mere creation of “transactional lawyers” anticipating risks {id. at 7746), and its wan assertion that the MTA agreement and Development Agreement do not “preclude” or are not “inconsistent” with a 10-year build-out. {Id. at 7748.) While it is correct that the agreements do not prevent a build-out in 10 years, ESDC itself acknowledges that the negotiation of the MTA agreement and Development Agreement was necessary due to the weak state of the economy. ESDC thus represents that the agreements were “structured” in order “to get the Project going in a difficult economic climate,” by “allowing] FCRC to purchase Project property in pieces and to proceed with the platform construction in three distinct phases.” {Id. at 7747.) ESDC also acknowledges, as of the date of the findings on the remand (December 16, 2010), that “it appears unlikely that the Project will be constructed on a 10-year schedule, because the construction of the Project’s residential buildings has lagged behind the 10-year schedule provided by FCRC to ESDC in 2009, and because of continuing weak general economic and financial conditions.” {Id. at 7749.) Its suggestion that it was unaware, when it entered into the Develop *340 ment Agreement and approved the 2009 MGPE) that the same economic downturn would prevent a 10-year build-out, strains credulity at best. ESDC’s further assertion that that FCRC has the financial incentive to pursue the Project to a “speedy conclusion” is unsupported by any financial analysis. (Id. at 7748.) Moreover, while FCRC asserts its intent to comply with its commitment to use commercially reasonable effort to complete the Project in 10 years (Gilmartin aff, dated Dec. 9, 2010, 11 27 [FCRC aff in opposition, exhibit A]), its papers in these proceedings are devoid of any detail showing its ability to do so.[4]
In short, ESDC’s invocation of the commercially reasonable effort provision rings hollow in the face of the specific deadlines in the Development Agreement — discussed at length in the November 9, 2010 decision and not disputed by ESDC on the remand — which clearly contemplate a schedule for construction of the post-arena phase of the Project that may not see even one Phase II building “initiated” until 2020, that does not require commencement of the construction of the platform on which 6 of the 11 Phase II buildings will be built until 2025, and that may extend beyond the purported 2019 build date for 16 years, until 2035.
The court accordingly finds that ESDC’s use of the 10-year build date in approving the 2009 MGPP lacked a rational basis and was arbitrary and capricious. In so holding, the court recognizes, as the Appellate Division held in a prior litigation involving the Atlantic Yards Project, that a mere inaccuracy in the build date will not invalidate the basic data used in the agency’s environmental assessment. (See DDDB I, 59 AD3d at 318; see also Matter of Committee to Preserve Brighton Beach & Manhattan Beach v Council of City of N.Y., 214 AD2d 335 [1st Dept 1995], lv denied 87 NY2d 802 [1995].) However, as the Court also held, ESDC’s choice of the build year is not immune to judicial review but, rather, is subject to review under the rational basis or arbitrary and capricious standard that is applicable to judicial scrutiny of any agency action in an article 78 proceeding. (DDDB I at 318.) In the instant case, ESDC’s continuing use of the 10-year build date was not merely inac *341 curate; it lacked a rational basis, given the major change in deadlines reflected in the MTA and development agreements. SEIS
Having concluded that ESDC’s use of the 10-year build date lacked a rational basis, the court turns to the issue of whether ESDC was required to prepare a supplemental environmental impact statement prior to its approval of the 2009 MGPE In concluding that an SEIS was not required, ESDC relies on the Technical Analysis prepared by its environmental consultant in December 2010 after the remand, and on the 2006 FEIS and the technical memorandum prepared at the time of the approval of the 2009 MGPE The technical memorandum concluded, and the Technical Analysis affirms, that the 2009 MGPP will not result in any significant adverse environmental impacts that were not already disclosed in the FEIS. The technical memorandum assumed a 10-year build-out but examined environmental impacts on certain conditions such as traffic and transit under a delay scenario, due to adverse economic conditions, extending to 2024. The Technical Analysis purports to examine an “Extended Build-Out Scenario” to 2035. (Technical Analysis, section E, “Construction Period Impacts,” SAR 7669 et seq.)
The conclusion in the Technical Analysis that an extended delay to 2035 would not have significant adverse environmental impacts that were not addressed in the FEIS is, in turn, based on the repeated assertions that the delay in the build-out would result in prolonged but less “intense” construction, and that most environmental impacts are driven by intensity rather than duration. As the Technical Analysis states, *342 The Technical Analysis concludes that for such areas of environmental concern as traffic, noise, and air quality, the adverse environmental impacts would be the same as, or less than, those identified in the FEIS. (Id. at 7689-7694 [traffic]; 7698-7704 [noise]; 7694-7698 [air quality].)
*341 “the determination of significant adverse impacts during construction relies mainly on the intensity of construction activities and their potential effects on the environment. Since these activities would move through the development area as Project components are being constructed, they would not have prolonged effects on individual uses in the area. Therefore, most areas of environmental concern would be independent of the overall duration of Project construction under the Extended Build-Out Scenario.” (Technical Analysis, SAR at 7670, 7685 [“(W)ith the prolonged schedule, there would be less overlap of (construction) activities for different buildings, resulting in overall lower intensity in construction activities on the Project site”].)
*342 The Technical Analysis, which was prepared with marked speed in the month after the remand, does not support these findings with any technical studies on the effects of significantly prolonged construction on various areas of environmental concern. Rather, it appears to take the position that it is a matter of common sense that less intense construction will result in lower impacts for conditions such as traffic, noise, and air quality.
Even assuming arguendo that ESDC’s commonsense assumption is correct, under established standards for environmental impact analysis, the duration of construction activities is a factor that is required to be taken into account in assessing the impacts on both environmental conditions such as traffic, noise, and air quality, which are amenable to quantitative analysis, and conditions such as neighborhood character, open space, and socioeconomic conditions, which are largely subject to qualitative analysis. ESDC does not dispute that the City Environmental Quality Review Technical Manual (Manual) establishes an accepted analytical framework for government agencies in assessing a project’s likely environmental effects. (See ch 2 at 2-1.) This Manual, which provides for the “reasonable worst case development scenario” to be used for the analysis (id. at 2-3), repeatedly refers to the duration of the construction as a factor to be considered in performing the environmental assessment. As to conditions such as traffic, air quality, and noise, the Manual states that duration is not the sole factor but is to be considered among other factors, including construction intensity and project location. (Ch 22 at 22-4, 22-6.) As to neighborhood character, the Manual provides that a construction impact analysis “looks at the construction activities that would occur on the site (or portions of the site) and their duration.” (Id. at 22-6.) Similarly, the Manual provides that “[a] construction impacts analysis for open space should be conducted ... if access to the open space would be impeded for an extended period during construction activities.” (Id. at 22-7.) As to socioeconomic conditions, the Manual states that
“[i]f the proposed project would entail construction of a long duration that could affect the access to and *343 therefore viability of a number of businesses, and the failure of those businesses has the potential to affect neighborhood character, a preliminary assessment for construction impacts on socioeconomic conditions should be conducted.” (Id. at 22-6.)
Notwithstanding these established guidelines for environmental analysis, the Technical Analysis does not undertake a meaningful assessment of the impacts of the potentially vastly extended period of construction on the various areas of environmental concern. As indicated above, it takes the position that the impacts on most areas of environmental concern will be “independent” of duration. (See supra at 341.) Although it purports to examine construction delays to 2035 under its Extended Build-Out Scenario, in discussing areas such as traffic, noise and air quality, it in fact assumes, as did the technical memorandum, that Phase II construction will not be stalled or deferred for years, but will proceed continuously on a parcel-by-parcel basis, and that the impacts will accordingly be less “intense” or will move throughout the Project, minimizing the impacts. (Technical Analysis, SAR at 7683, 7685; 7689-7690 [traffic and transportation]; 7694-7696 [air quality]; 7698 [noise]; see Technical Analysis, SAR at 7677-7680 [summarizing technical memorandum].)
The Technical Analysis takes a similar approach to other areas of environmental concern which were the subjects largely of qualitative analysis. The Technical Analysis does not undertake any analysis of extensive delays between the completion of the arena, anticipated for 2012, and Phase II construction — the commencement of which, as indicated by the Development Agreement, may be delayed until 2020 for the first Phase II building on block 1129, and until 2025 for the beginning of Phase II construction of the platform that will support 6 of the 11 Phase II buildings; and the completion of which, as indicated by the Development Agreement, may be delayed until 2035. Notably, the Technical Analysis is silent as to the impacts on neighborhood character and socioeconomic conditions of vacant lots, above-ground arena parking, and construction staging which may persist not merely for a decade but, as petitioners aptly put it, for a generation.
More particularly, as to neighborhood character, the Technical Analysis fails to evaluate the impact of extensive delays in the build-out of Phase II. The Technical Analysis concludes that construction impacts on neighborhood character under the *344 Extended Build-Out Scenario would remain “localized” in the immediate vicinity of construction, but “would be less intense because there would be less simultaneous activity on the site.” (SAR at 7704.) Again, the Technical Analysis focuses on intensity of the construction, and does not address the impacts of a construction period that could extend not merely for a decade but for 25 years. As to the above-ground parking lot and construction staging area on block 1129, the Technical Analysis rests on the bare assertion that although it
“would be prolonged with the Extended Build-Out Scenario, it would not be occupied by a 1,100-car surface parking lot for the entire construction duration. As sites are developed on Block 1129, the above-ground interim parking lot would be reduced as parking is provided below-grade. Furthermore, construction of at least one of the four buildings on Block 1129 would be started by 2020.” {Id. at 7705.)
The Technical Analysis asserts that 2020 is merely an “outside date” {id.), and does not evaluate the impacts of the potential eight-year or more delay between the construction of the arena and the commencement of any construction of underground parking for the arena.
As to open space, the Technical Analysis notes that the provision of eight acres of publicly accessible open space is a “key component of the Project.” {Id. at 7686.) As touted in the FEIS, the open space element of the Project will connect the neighborhoods to the north and south of Atlantic Avenue, for the first time in a century. (FEIS, ch 16; AR at 1061.) The Technical Analysis further notes that the FEIS identified a “temporary significant adverse open space impact . . . between the completion of Phase I and the completion of Phase II.” (SAR at 7686.) However, the analysis of the impact of significantly delayed construction on open space is limited to the conclusory assertion that
“[wjith the Extended Build-Out Scenario, the temporary impact identified in the FEIS would extend longer, but would continue to be addressed by the incremental completion of the Phase II open space. As each of the Phase II buildings is completed, the adjacent open space would be provided in conformance with the 2006 Design Guidelines.” {Id.)
Again, although the Technical Analysis purports, under its Extended Build-Out Scenario, to examine the impacts of a delay until 2035 in building the Project, it assumes, as did the techni *345 cal memorandum, that the Phase II buildings will proceed on a parcel-by-parcel basis, and does not examine the impacts of years of potential delays before the commencement of any of the Phase II buildings.
In concluding that preparation of an SEIS is not warranted, the Technical Analysis also repeatedly cites mitigation measures imposed by the FEIS and by an amended memorandum of environmental commitments (amended memo) made as part of the approval process for the 2009 MGPP (See Technical Analysis, SAR at 7680; amended memo, SAR at 8034.) However, these measures were adopted to mitigate the adverse environmental impacts identified in the FEIS and technical memorandum, which assumed that the build-out of the Project would take 10 years. The Technical Analysis does not consider the adequacy of these mitigation measures for a significantly prolonged construction period.
The regulations which implement SEQRA provide that the lead agency — here, ESDC — “may require a supplemental EIS, limited to the specific significant adverse environmental impacts not addressed or inadequately addressed in the EIS that arise from: [a] changes proposed for the project; or [b] newly discovered information; or [c] a change in circumstances related to the project.” (6 NYCRR 617.9 [a] [7] [i] [a]-[c].) As discussed in the prior decisions, the court’s review of a SEQRA determination “is limited to ‘whether the agency identified the relevant areas of environmental concern, took a “hard look” at them, and made a “reasoned elaboration” of the basis for its determination.’ ” (Matter of Riverkeeper, Inc. v Planning Bd. of Town of Southeast, 9 NY3d 219, 231-232 [2007], quoting Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 417 [1986].) An agency’s determination whether to require an SEIS is discretionary. (Id. at 231.) “The lead agency . . . has the responsibility to comb through reports, analyses and other documents before making a determination; it is not for a reviewing court to duplicate these efforts.” (Id. at 232.) The agency’s determinations under SEQRA “must be viewed in light of a rule of reason. Not every conceivable environmental impact, mitigating measure or alternative must be identified . . . The degree of detail with which each factor must be discussed obviously will vary with the circumstances and nature of the proposal.” (Matter of Jackson, 67 NY2d at 417 [internal quotation marks and citations omitted]; accord Matter of Eadie v Town Bd. of Town of N. Greenbush, 7 NY3d 306, 318 [2006].)
*346 As the Court of Appeals has repeatedly emphasized, “the courts may not substitute their judgment for that of the agency for it is not their role to weigh the desirability of any action or to choose among alternatives.” (Riverkeeper, Inc., 9 NY3d at 232 [internal quotation marks, citations, and brackets omitted].) Nevertheless, judicial review must be “meaningful.” (Id.) It is the court’s responsibility to “ensure that, in light of the circumstances of a particular case, the agency has given due consideration to pertinent environmental factors.” (Akpan v Koch, 75 NY2d 561, 571 [1990].)
Thus, a determination not to undertake a full environmental review will be set aside where the agency fails to address affected areas of environmental concern. (See e.g. Matter of Chatham Towers, Inc. v Bloomberg, 18 AD3d 395 [1st Dept 2005], modfg on other grounds 6 Misc 3d 814 [Sup Ct, NY County 2004], lv denied 6 NY3d 704 [2006] [negative declaration held improper]; Matter of Segal v Town of Thompson, 182 AD2d 1043, 1046 [3d Dept 1992] [negative declaration improper where “little or no consideration was given to a variety of potential environmental impacts”].) An agency determination under SEQRA will also be set aside where the agency’s review of the environmental impacts is unsupported by studies and data or is conclusory. (See e.g. Tupper v City of Syracuse, 71 AD3d 1460 [4th Dept 2010], lv denied 74 AD3d 1880 [2010]; Matter of Baker v Village of Elmsford, 70 AD3d 181 [2d Dept 2009]; Matter of Serdarevic v Town of Goshen, 39 AD3d 552 [2d Dept 2007].)
Here, ESDC’s hastily prepared Technical Analysis performs a perfunctory analysis of the impacts of the extended delay in constructing the Project. As discussed above, the Technical Analysis assumes, without any corroborating studies, that the environmental impacts will largely be independent of the duration of construction. It thus fails to undertake a meaningful analysis of the effects, on such important areas of environmental concern as neighborhood character, of the potentially protracted delays, identified in the Development Agreement, of eight or more years after completion of the arena in commencing Phase II construction, and of more than 15 years, or until 2035, in completing Phase II construction. The court accordingly holds that ESDC failed to comply with its obligation under SEQRA to take a hard look at the environmental impacts of the 2009 MGPP, and that it must prepare an SEIS addressing the potential delays, identified in the Develop *347 ment Agreement, in Phase II construction. (See generally Matter of E.F.S. Ventures Corp. v Foster, 71 NY2d 359, 373 [1988] [environmental review on modification of plan should be addressed to environmental impact of proposed modification, not perceived problems which should have been or were addressed earlier in the environmental review process].)
The court notes that its directive to ESDC to prepare an SEIS is not based on the mere fact that the MTA agreement permits FCRC’s phased acquisition of the air rights necessary for construction of six of the Phase II buildings, rather than requiring it to acquire all of the air rights at the outset, as had been provided for in the original plan. Such a change, without more, would not require a de novo environmental review. (See Matter of Wilder v New York State Urban Dev. Corp., 154 AD2d 261 [1st Dept 1989], lv denied 75 NY2d 709 [1990].) Nor would further environmental review be required based on routine delays in the construction process or delays occasioned by the SEQRA review process. (See Matter of Jackson, 67 NY2d at 425.)
An SEIS is required here because the phased acquisition authorized by the MTA agreement, and the extended deadlines contemplated by the Development Agreement, made a major change to the construction schedule for Phase II of the Project, but ESDC has failed to give adequate consideration to the environmental impacts resulting from this change.
Under the established standards for SEQRA review, the court must not, and does not, take a position on the desirability of the Project or the environmental impacts of the extension of the construction schedule. It is for ESDC to determine, after performing an adequate environmental review, whether the extension has significant adverse environmental effects not identified in the FEIS, or requires further mitigation measures. It is, however, the court’s responsibility to ensure that ESDC performs its responsibility to comply with the statutory mandate that it take a hard look at the impacts and provide a reasoned elaboration of the basis for its decision. In approving the 2009 MGPI) ESDC failed to do so. It performed an inadequate analysis of the effects of the change in schedule on neighborhood character, although the MTA and Development Agreement potentially more than doubled the build-out of the Project. An SEIS is required under these circumstances. The public relies on a meaningful environmental review process, and SEQRA requires no less.
*348 Stay
Although the court has determined that ESDC must prepare an SEIS, the court is unpersuaded that the Project should be invalidated and construction of the arena and other Phase I construction halted, as petitioners request, pending ESDC’s further environmental review. Phase I construction is already well under way, with completion of the arena anticipated in 2012. It is undisputed that infrastructure for the Project commenced in 2007 and is nearly complete, extensive excavation and foundation work on the arena has already been performed, work on a new subway entrance is in progress, and a temporary rail yard for the MTA has been completed, with remediation work in progress on the site of the permanent rail yard that FCRC is required to construct. (Gilmartin aff, dated Feb. 16, 2011, U1Í 6-8 [FCRC aff in opposition].) Extensive public and private funds have already been committed to Phase I construction.
Significantly, this is not a case in which the Project has been implemented without any prior “valid environmental review.” (Compare Chinese Staff & Workers Assn. v City of New York, 68 NY2d 359, 369 [1986]; Matter of Tri-County Taxpayers Assn. v Town Bd. of Town of Queensbury, 55 NY2d 41 [1982].) The 2006 plan for the Project was approved only after preparation of an FEIS and a public hearing, the sufficiency of which was affirmed on appeal. (DDDB I, 59 AD3d 312 [2009], supra.) While the 2009 MGPP made certain design changes to Phase I of the Project, including the design of the arena facade and a possible reconfiguration of the “Urban Room” subway entrance (see technical memorandum, AR at 4749, 4752), these changes are not the subject of petitioners’ challenge. It is also undisputed that the 2009 MGPP did not change the design, configuration, or uses of the Phase II buildings. (Technical memorandum, AR at 4749.) Nor did the MGPP change the Project’s “land uses, building layout, density, [or] the amount of affordable housing and publicly accessibly open space.” (Id. at 4759.) This case therefore does not involve a claim that further environmental review is required of the essential substantive features of the Project — review that ordinarily would not be permitted after the fact, in the event of a finding of noncompliance with SEQRA. (See Chinese Staff & Workers Assn., 68 NY2d at 369.)
Nor is environmental review required due to changes to the timing of Phase I of the Project. Although, as held above, the 2009 MGPP made a major change to the construction schedule *349 of Phase II, petitioners do not claim that the MGPP effected a material change to the build-out of the arena or other Phase I construction. (See supra at 334.)
Given the extent to which construction of Phase I has already occurred, under a plan which has been subjected to and withstood challenge, the court declines to stay Phase I of the Project. (See e.g. Matter of Chatham Towers, Inc. v Bloomberg, 18 AD3d 395 [2005], supra; Matter of Silvercup Studios v Power Auth. of State of N.Y., 285 AD2d 598 [2d Dept 2001]; Golden v Metropolitan Transp. Auth., 126 AD2d 128 [2d Dept 1987].)
It is noted that Phase I use of block 1129 for a temporary aboveground parking lot for the arena is a use that was specifically contemplated in the FEIS (see AR, at 845), and that ESDC has required certain mitigation measures for the parking lot, such as fencing and landscaping. (See amended memo, SAR at 8055.) As this parking lot is part of the plan that was approved for Phase I, a stay would not be appropriate at this time. However, given the potential delays in Phase II construction, including construction of underground parking that would replace the aboveground lot, further environmental review must be undertaken, in the SEIS that the court has directed, of the impacts of such delays and of whether additional mitigating measures or alternatives are needed for the block 1129 lot.
Finally, a stay of Phase II construction would be premature, as it is undisputed that Phase II work will not commence for many years. ESDC will have an ample opportunity, before commencement of Phase II construction, to review the environmental impacts of the delay in the Phase II build-out. In the unlikely event that FCRC is ready to proceed with Phase II before the environmental review has been completed, petitioners may renew their request for a stay.
It is accordingly hereby ordered that the supplemental petitions are granted to the following extent:
It is ordered and adjudged that the matter is remanded to ESDC for further environmental review consistent with this decision, including preparation of a supplemental environmental impact statement assessing the environmental impacts of delay in Phase II construction of the Project; the conduct of further environmental review proceedings pursuant to SEQRA in connection with the SEIS, including a public hearing if required by SEQRA; and further findings on whether to approve the MGPP for Phase II of the Project.

„ The supplemental administrative record refers to exhibits submitted in connection with the supplemental petitions. The administrative record (AR) refers to exhibits submitted in connection with the prior article 78 proceedings under the same index numbers.

. To the extent that ESDC claims that the MTA agreement or development leases gave notice of a 2030 outside date for completion of the Project, ESDC took a completely contrary position in its original opposition to the petitions, claiming that
“a sunset provision establishing the date on which the relationship between the developer and ESDC would come to an end with respect to a specific development parcel, whether or not a Project building has been successfully constructed on that parcel, sheds no light on the schedule for construction anticipated by the parties.” (30 Misc 3d at 629.)
In any event, as discussed in the text, ESDC was silent as to the outside date for Phase II in the Development Agreement, and the other disparities between Phase I and Phase II deadlines.

. As more specifically discussed in the prior decision:
“As the issue before this court is the impact of the Development Agreement on ESDC’s determination to use the 10-year build-out and to approve the 2009 MGPP without requiring an SEIS, the detailed provisions of the Development Agreement regarding scheduling of the construction must be reviewed: The Agreement provides for commencement and construction of the Arena well within the 10-year period. (§ 8.4; Appendix A [requiring the arena to be the first or second building for which construction is commenced, and requiring the substantial completion of the arena by the ‘outside arena substantial completion date,’ defined as the sixth anniversary of the Project effective date or by 2016].) It also provides for commencement of the Phase I buildings on the arena block well within the 10-year period (§8.6 [d] [providing, subject to certain exceptions, for commencement of Phase I buildings within 3 to 10 years of the Project effective date or from 2013 to 2020]), and for substantial completion of the Phase I buildings within a 12-year period. (§ 8.6 [providing for substantial completion of the Phase I construction within 12 years of the Project effective date or by 2022, subject to unavoidable delays].) The agreement defines as events of default failure to commence or substantially complete the arena within the preceding deadlines (§ 17.1 [b], [d]) and failure to commence or substantially complete the Phase I construction within such deadlines. (§ 17.1 [i], [1].) Upon the occurrence of these events of default, FCRC is required to pay substantial liquidated damages (schedule 3 liquidated damages). For the arena, these damages are set at $75 million for failure to timely commence construction. (Schedule 3 at 1.) They may amount to as much as $341 million for failure to meet the outside substantial completion deadline, depending on the length of the default. (Id. at 2-3.) For Phase I, the damages for failure to timely commence construction may reach $5 million per building per year. (Id. at 4-5.) The damages for failure to meet the outside substantial completion date are based on a formula that takes into account the length of the default and the Phase I square footage that has been completed. The Phase I damages shown in the example range from $586,000 per year to $5.5 million. (See § 17.2 [a] [ii]; schedule 3 at 8-10.)
“In contrast, the Development Agreement does not provide for dates for commencement of Phase II construction other than for commencement of the platform which is needed to support the construction of certain Phase II buildings. The commencement of the platform is not required until the 15th anniversary of the Project effective date or 2025 (§ 8.5.) While failure to commence construction of the platform is defined as an event of default (§ 17.1 [g]), the significant schedule 3 liquidated damages are not a remedy for such default. (§ 17.2 [a] [ii].) The Development *338 Agreement requires Phase II construction to be substantially complete, subject to unavoidable delays, by the outside Phase II substantial completion date, which is defined as 25 years following the Project effective date or 2035. (§ 8.7.) Failure to substantially complete the Phase II construction is defined as an event of default (§ 17.1 [m]), but is not a basis for the payment of schedule 3 liquidated damages. (§ 17.2 [a] [ii].) Rather, the remedy for such default is ESDC’s option to terminate the applicable Project lease for any portion of the Project site on which construction of improvements has not commenced. (§ 17.2 [a] [vi].)
“The Development Agreement contains the following provision requiring FCRC to use commercially reasonable efforts to complete the project by December 31, 2019:
“ ‘[The FCRC developer entities] agree to use commercially reasonable effort to cause the Substantial Completion of the Project to occur by December 31, 2019 (but in no event later than the Outside Phase II Substantial Completion Date [defined in § 8.7 as 25 years following the Project effective date]), in each case as extended on a day-for-day basis for any Unavoidable Delays.’ (§ 2.2.)
“The Development Agreement provides that the article VIII deadlines for the performance of Phase I and II work shall not ‘modify, limit or otherwise impair’ FCRC’s obligations under the preceding provision. (§ 8.1 [d].) However, the remedies provided for failure to use commercially reasonable efforts to complete the Project by 2019 are uncertain or appear to be significantly less stringent than the remedies provided for FCRC’s failure to meet the deadlines for Phase I work.
“The Development Agreement provides that in the event of FCRC’s failure to use commercially reasonable efforts, ESDC may resort to remedies available through litigation — i.e., ‘any and all remedies available to ESDC at law or in equity under or in connection with this Agreement,’ including specific performance and damages. (§ 17.2 [d].) If ESDC were to claim a breach of the commercially reasonable efforts provision, a mixed issue of fact and law would be presented. While courts are adept at interpreting legal standards, determination of this issue would be complicated by the absence of settled authority. There is a substantial body of case law, under UCC 9-627, interpreting the term commercially reasonable manner in connection with dispositions of collateral. (See e.g. Bankers Trust Co. v Dowler & Co., 47 NY2d 128 [1979].) However, this authority is not factually relevant to the construction context. The parties have not cited, and the court’s research has not located, case law articulating standards for awarding damages or equitable relief for failure to use commercially reasonable efforts to meet construction deadlines. (Cf. 330 Hudson Owner, LLC v Rector, Church-Wardens & Vestrymen of Trinity Church in City of N.Y., 23 Misc 3d 1131[A], 2009 NY Slip Op 51018[U] [Sup Ct, New York County 2009].) *339 “The Development Agreement also does not define the failure to use commercially reasonable efforts as an event of default for which schedule 3 liquidated damages are available. (§ 17.2 [a] [ii].) It does appear that such failure would qualify as an event of default for which a notice to cure is required under a catchall provision for not otherwise specified defaults. (§ 17.1 [r].) For these unspecified defaults, the Development Agreement provides for liquidated damages in the amount of $10,000 per day until the defaults are cured, or the reduced amount of $1,000 per day if, in ESDC’s ‘reasonable determination,’ the default would not have a material adverse effect on the value or use of the Project site, or result in a condition hazardous to human health, or put the Project site in danger of being forfeited, or subject ESDC to criminal or civil liability or penalties. (§ 17.2 [a] [x].) These damages are significantly lower than the schedule 3 damages available for other specified events of default. In addition, imposition of these damages would require a predicate finding, subject to the legal uncertainties discussed above, that the commercially reasonable efforts provision had been breached.” (30 Misc 3d at 622-625 [footnotes omitted].)
The November 9, 2010 decision should have added that the Development Agreement also provides for commencement of construction of one Phase II building on block 1129 by 2020.

. In continuing to rely on the 10-year build date, ESDC also cites the feasibility of physically building the Project in 10 years, and the ability of the market to absorb the housing, especially in light of the strong demand for affordable housing units. (ESDC Response, SAR at 7748, 7749.) Petitioners have never disputed the unexceptional propositions that a 10-year construction schedule is physically possible or that the market can readily absorb affordable housing.